[Civ. No. 5242.  First Appellate District, Division Two.—November 10, 1925.]

JOHN WILLIAM McBRIDE, Respondent, v. CLARA BARTON HOSPITAL (a Corporation), Appellant.

[1] NEGLIGENCE—BURNING OF HOSPITAL PATIENT—ISSUES—AGENCY—BURDEN OF PROOF—EVIDENCE—INSTRUCTIONS.—In this action to recover damages for burns inflicted on plaintiff's leg while a patient in the hospital operated by defendant corporation, there having been no legal evidence before the court that either the nurse who put the hot-water bottles in the bed, or the nurse who put plaintiff in bed in contact with the hot-water bottles, or the special nurse who thereafter took charge of the case or any of them, was not the agent of defendant, and the law having imposed on defendant the burden of introducing evidence to show that said individuals, and especially the latter two nurses, were not its agents and that defendant was not guilty of negligence, and defendant having wholly failed to sustain that burden, the court properly instructed the jury that the only question before them was "the question of damages this boy is entitled to recover"; and there was no evidence before the court calling for the application of defendant's requested instructions relating to the nonliability of defendant for the carelessness of a special nurse employed by plaintiff or his parents or for the negligence of a person in an independent employment, over whom defendant exercised no control or supervision.

[2] ID.—LIMITATION OF LIABILITY—POSTING OF NOTICES—KNOWLEDGE—EVIDENCE.—In such action, there having been evidence to the

---

1. See 13 Cal. Jur. 773.

2. Liability of private or noncharitable hospital for improper care or treatment of patient, notes, 39 A. L. R. 1431; 22 A. L. R. 341.

effect that defendant had posted in different places in its premises certain notices limiting its liability, but there having been no evidence that plaintiff (a minor) or his parents saw or read the notices or entered into any contract limiting the liability of defendant, the trial court did not err in refusing to admit the contents of the notices in evidence.

[3] Id.—Employment of Special Nurses—Local Custom—Evidence. In this action to recover damages for burns inflicted on plaintiff's legs while a patient in the hospital operated by defendant, the trial court did not err in sustaining plaintiff's objection to evidence proffered by defendant for the purpose of showing what was claimed to be the local custom in regard to hospitals employing special nurses called in from the outside, controlling and supervising such nurses, and collecting for and paying to such nurses their compensation.

[4] Id.—Order of Proof—Rebuttal—Surprise—Waiver.—In such action, the trial court did not err in receiving as in rebuttal the testimony of plaintiff's father with reference to the identity of the persons present at the operation performed on plaintiff and of the nurse who put plaintiff to bed, and as to the subsequent arrival of the special nurse; and if defendant was taken by surprise by such testimony, it could have asked for a continuance or for the privilege of introducing any appropriate evidence to meet the testimony of the father, and where it failed to take either of those courses, it may not complain on appeal.

(1) 30 C. J., p. 470, n. 95, 7, 8; 38 Cyc., p. 1618, n. 36, p. 1619, n. 38.   (2) 30 C. J., p. 470, n. 96.   (3) 30 C. J., p. 470, n. 96. (4) 3 C. J., p. 773, n. 62, p. 828, n. 70.

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles Monroe, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. H. Dehm for Appellant.

Carroll Allen, Lorrin Andrews and Howard L. Grace for Respondent.

STURTEVANT, J.—The plaintiff, a minor, commenced an action to recover damages for burns inflicted on his leg while a patient in the hospital operated by the defendant

3.   Nurse as an independent contractor, note, 19 A. L. R. 1189.
4.   See 24 Cal. Jur. 767.

corporation. The defendant answered; a trial was had in the lower court before a jury; the jury brought in a verdict for $5,000; a judgment was entered for that sum, but on the presentation of a motion for a new trial the plaintiff consented to waive $2,000 of the verdict and that the judgment be reduced to the sum of $3,000. Thereupon the motion for a new trial was denied and the defendant has appealed, bringing up a bill of exceptions.

Mrs. McBride, the mother of the plaintiff, testified: "That at the date of the trial the plaintiff was nine years of age; that in February, 1920, Mr. McBride and I were living at 1147 Benton Way, Los Angeles; we had but one child, Johnnie, and at that time there was nothing the matter with his health except for his tonsils and his nose bothering him; I consulted Dr. Ruddy, who advised that there was a growth in the nose and that it should be removed and that his tonsils should be removed; the doctor advised me to go to the Clara Barton Hospital. Later I called the hospital on the telephone and engaged a private room. On Friday morning, February 6, 1920, we took the child to the hospital about 7 A. M. When we arrived there we registered and I stated that we wanted a special nurse detailed on the case. We were taken to a ward-room containing several beds and when I stated that I had engaged a special room I was told that the hospital had none and that the bed in the ward was the only vacant bed. The child was put to bed undressed. At that time he was perfectly conscious. About 8 o'clock attendants took him in a wheel-chair and the child was operated upon. While the child was absent from the room the witness remained in the ward-room and in the hall adjacent. A nurse in a blue drab uniform with a white apron and cap (hospital uniform) came forward and made the bed and put a hot water bottle in the bed. I asked why that was done and the nurse replied 'that it was necessary, when a patient is coming out of an anaesthetic, to have the bed warm.' There were very likely three hot water bottles put in. The nurse was a young girl. After she put the hot water bottles in the bed she left and I did not see her again. After the child was brought from the operating room and placed in bed I went into the room and remained there until about noon. During that time the child was unconscious. When I entered the room

the second time there were present a nurse (Miss Woodward), dressed all in white, Mrs. McBride, and the doctor who had given the anaesthetic. Before that time I had not seen Miss Woodward. In reply to a question by me the nurse stated that she was to be the nurse on the case. I next saw John the next morning; the nurse told me 'that she was very sorry that John had been burned on hot water bottles; that she had shown the burn to the doctor and head nurse and they had bandaged it up and it would be all right in a few days.' The nurse was there when I arrived about 9 A. M.; I had not hired any nurse; I did not do anything about a special nurse other than has been stated above. John was conscious but I did not see his leg; he stayed in the hospital until the following Monday at noon. I was there every day but did not see his leg at any time; no one offered to show it to me and nothing else was said about it. On the Monday following the nurse, Miss Woodward, carried John out to the machine and told the witness that she would be out the next day to dress the burns. The nurse came to the house the next day. Her coming was not at my request. She came about a month or six weeks after that to treat the burn." On cross-examination the witness testified: "I asked them to detail a nurse to me; I asked whoever was in the hospital; that was not over the telephone, that was when I went down there that morning. The nurse in white who was in the ward-room when I went into the room after the operation was Miss Woodward and she remained on the case and was the same individual who went to our house to dress the boy's leg. On one of those visits I asked Miss Woodward to have a doctor come to examine the burn. The boy's tonsils were healed and he could eat and drink before he left the hospital. Dr. Sprague came to the house twice to treat the boy. The first visit was made within three weeks after the boy returned home. He unwrapped the wound and dressed it and gave the nurse instructions. About a week later he did the same thing. He did not return any more. We did not have any other doctor after that. The nurse came for a month or six weeks, a couple of times a week, then she did not come any more."

Marie Hodgdon, a witness called on behalf of the defendant, testified: "In the month of February, 1920, I was em-

ployed as superintendent of nurses in the defendant's hospital and was there when John McBride was received as a patient. At that time the defendant did not have any special nurses in the hospital. When any person wanted a special nurse we did not have any nurses employed by the hospital that would go on special duty. I had known Miss Woodward about a year and a half before that. She was a graduate nurse; she had never been employed in the hospital up to that time. She was not employed at the Clara Barton Hospital at that time. There was a request made in this case for a special nurse. I obtained Miss Woodward. My duties as superintendent of nurses are that I have charge of the student nurses in the hospital, in the training school. I did not have any control or supervision over special nurses who came into the hospital to take care of cases. The special nurses report to the superintendent of nurses. Miss Woodward reported to the superintendent of nurses' office; that is my office; I mean when she first came she reported to the superintendent's office to see what room she is going to. After she has taken charge of the patient she reports as to the condition of the patient to the doctor. After that I have no authority as superintendent of nurses to discharge her. I have authority to discharge the undergraduate nurses that are in the hospital right along. The custom in regard to preparing the bed for a patient who comes for an operation is that the bed is made with the blankets and hot water bottle put in to keep the bed warm and those bottles are removed when the patient is put in. That is a custom of the hospital; I know the custom of the hospitals in this city. It is the duty of the nurse in charge of the case who receives the patient to take out the hot water bottle, whether one of our nurses or whether a special nurse—whoever is in charge of the room when the patient comes. No part of the money that was collected for the special nurse Miss Woodward was kept by the Clara Barton Hospital. Supervising nurses have charge of the floors—the head nurses. I have tried but am unable to locate Miss Woodward.. I did not send her to the McBride home after the boy left the hospital. I did not know anything about her going until this case came up." On cross-examination the witness further testified: "Miss Woodward was not employed in the hospital before that time. After that time she was employed as a night nurse.

She was so employed from May until July, after that I don't know what happened to her. She left of her own accord; she was not discharged. I don't know who put the hot water bottle in the bed. The uniform of the students in February, 1920, was blue with white aprons. If the case is on general it is the custom of these young girls to attend to the hot water bottle, that is, put it in and take it out—they carry the hot water bottle in and take it out under my supervision and order. It is not always the business of the nurse in the hospital to put the hot water bottle in the bed. They do sometimes. If the special nurse has not arrived when the operation is over that is done by the hospital nurse. They take it out if the case is on general; if the case is on special the special nurse looks after the patient entirely. These student nurses work in the hospital under my instructions. I do not know whether these hot water bottles were tested before they were put in the bed of little John McBride. The special nurse had arrived at the hospital when he was taken from the operating-room. I know because she reported in. I know the boy had not been taken from the operating-room when she reported, from the chart, from the record. I am just repeating what I understand from the record. I say that the special nurse came before the boy was removed to the ward-room because of the chart. The chart reads, '9:45, from surgery; pulse good; respiration poor; doctor called and removed nasal pack.' That is in Miss Woodward's handwriting. The chart also reads, 'Friday 7:30 patient entered hospital, walked to room 114 to bed; ready for surgery; to surgery,' that is all in Miss Woodward's handwriting. The chart also reads, '4:50 blisters on leg,' below it reads 'Doctor Ruddy notified,' and on the next line 'blisters opened,' below that '6:30 dressing applied to leg.' I don't know whether the portion of the chart 'from surgery' in Miss Woodward's hand, means whether she first saw him when he came from surgery. A nurse is not supposed to make any entries excepting what she sees. I don't remember at this time whether I personally had any conversation with Mrs. McBride from the start to the finish of this matter. I don't remember whether I was the one that had the first conversation with her about the nurse or not. No student nurse had anything to do with the patient after he was brought into the room until after

he was burned. My knowledge is from the chart. I cannot remember each individual case. When a special nurse goes on a case, our nurses have nothing to do with it because she has special charge of the case.''

Dr. Barton, called as a witness for the defendant, testified: ''I am president and general manager of the Clara Barton Hospital in Los Angeles. In our hospital we do not have any special nurses. When a patient comes to our hospital and wants a special nurse it is the custom of the hospital to telephone outside—look in the nurses' directory. I don't think Miss Woodward was employed by our hospital in February, 1920, because those things are turned over to the superintendent of nurses and I don't have personal knowledge. If she was a special nurse she was not employed by our hospital. We have no control of the special nurses at all. They report to the doctor in charge of the patient. He is not one of our doctors. Dr. Ruddy never was connected with the hospital in any way. I know what the custom is in regard to preparing the bed where a patient is undergoing an operation. The custom is that the bed is prepared with blankets and the hot water bottle put in there, and when the anaesthetized patient is returned to the bed the fixed rule of the hospital is to remove the hot water bottle. It is the duty of the nurse in charge of the patient at the time the patient is returned to take out the hot water bottle. When Miss Woodward went out to the house from time to time to change the dressing after the patient went home, that was not done under my direction nor the direction of the hospital. We did not pay her for any services rendered in that connection. Dr. Sprague, who went out there several times and dressed the wound, was not employed by us. He did not go out there under my direction. I never received any word from Mrs. McBride or from Miss Woodward that we should send a nurse or a doctor out there. I never heard of this matter after the patient left the hospital until suit was filed against us. It is the custom in our hospital when a special nurse is employed in a case that we collect a fee for them. The hospital gets no part of it. The hospital did not get any part of Miss Woodward's fee. We got money for the board of the nurse and for the room, but no money for her compensation. We collect for the nurse just for accommodation—that is the custom. We never

paid Miss Woodward any more than the amount that was collected, the $15 shown by the bill. The hospital has no authority to discharge the special nurse who is employed. The doctor in charge of the patient—the doctor in charge of the case, or else the patient, has that authority.'' On cross-examination Dr. Barton testified further: ''We have a regular printed form of bill, 'Hospital room,' 'Board of special nurse,' 'Special nurse's fee,' 'Use of surgery,' are printed on each bill as a matter of accommodation to save writing the words 'Special nurse.' We do not charge any board for regular nurses. We do not charge any board for our supervising nurse. I do not know when Miss Woodward came.''

Iva B. Lounsbury, called as a witness by the defendant, testified: ''I know the custom in the hospital in regard to employing and paying a special nurse. The hospital makes no charge nor takes any part of the pay of the special nurse. In this case the hospital received nothing except what is shown on the bill. In this case the hospital charged Mrs. McBride $23.70 which does not include $10 collected for Dr. Biddle for giving the anaesthetic, nor a fee for Miss Woodward. That is the hospital charge. I did not enter in our cash book the $15 for Miss Woodward, or the $10 for Dr. Biddle.''

In rebuttal John W. McBride was called as a witness for the plaintiff. He testified: ''I am the father of the plaintiff. I was present at the operation. There was a regular hospital attendant in the surgery-room when the operation was going on. Miss Woodward was not there. After I left the surgery-room I accompanied the boy to his room. Miss Woodward was not there. A nurse put the boy to bed. She was dressed in regular probation nurse, blue and white I guess. After the patient was in bed was the first time I saw Miss Woodward in the room. I saw her come in the room after the boy was placed in bed. The other nurse went on about her duties I presume. This nurse stated that she had charge of the case.''

All of the evidence given by Mr. McBride was objected to as not being in rebuttal, nevertheless it was admitted. No motion for a continuance was made, but when the time arrived the appellant cross-examined Mr. McBride. On cross-examination the witness testified: ''Mrs. McBride arranged with the hospital to supply the room with a special nurse.

I don't know when she told the hospital she wanted to get a special nurse; I was not present when my wife made arrangements about a special nurse. I was there all the time when the operation was going on in the operation-room. I came down with the boy when he was wheeled in. The man that administered the anaesthetic and a hospital attendant also came down. By a hospital attendant I mean a girl that worked in the hospital—probation nurse I call them. I don't know whether that is right or not. When the boy had been in bed Miss Woodward appeared and stated she was the special nurse.''

[1] After the foregoing evidence had been received the case was argued to the jury. Thereupon the court instructed the jury that, ''There is only one question for you to consider in this case and that is the question of damages this boy is entitled to recover.'' Continuing, the court fully instructed the jury on the rules governing it in estimating damages. We do not understand that the appellant questions the correctness of any of the latter instructions. However, in connection with the first instruction which the trial court gave appellant contends that the trial court erred in refusing to give numbers V and VI of the instructions requested by the appellant. Those two instructions were worded as follows: ''V. You are instructed that if the injuries claimed to have been sustained by the plaintiff, were caused solely by the fault, carelessness, or negligence, of a special nurse employed by the parent, or parents, of the said plaintiff, and that the said special nurse was not at the said time in the employ, nor under the control or supervision of the defendant, then your verdict should be for the defendant. VI. You are instructed that a person, or corporation, is not liable for the negligence, or carelessness, of a person in an independent employment, over whom he, or it, exercises no control, or supervision.'' In view of the evidence which we have recited above we think it is quite clear indeed that the trial court committed no error in giving the instruction taking from the jury all issues excepting the amount of the damage. There was no legal evidence before the trial court that the first nurse (name not disclosed by the record) mentioned by Mrs. McBride, nor the nurse mentioned by Mr. McBride as the nurse that put the plaintiff in bed in contact with the hot water bottles (name of nurse

also not disclosed), nor that Miss Woodward, the special nurse, and each of them, were not the agents of the defendant. The plaintiff made out a case for the jury. The law imposed on the defendant the burden of introducing evidence to show that said individuals, and especially the two last named, were not its agents, and that the defendant was not guilty of negligence. (*Meyer* v. *McNutt Hospital,* 173 Cal. 156 [159 Pac. 436].) It wholly failed to sustain that burden. There was no evidence before the court calling for the application of the rules stated in instruction number V, or instruction number VI, assuming, but not deciding, that such rules are correctly stated.

All other requested instructions became immaterial in view of the first instructions given by the trial court.

[2]. There was evidence that the appellant had posted in different places in its premises certain notices limiting its liability. There is no evidence that the plaintiff or his parents saw or read the notices or entered into any contract limiting the liability of the appellant. The appellant does not call to our attention any statute which authorizes a hospital to limit its liability by posting notices. The trial court did not err in refusing to admit the contents of the notices in evidence. (*Carter* v. *Service Co.,* 160 Iowa, 78, 90 [141 N. W. 26].)

[3] During the trial the appellant sought to introduce in evidence what it claimed to be the custom obtaining in the city of Los Angeles in regard to hospitals employing special nurses called in from the outside, controlling and supervising such nurses, and collecting for and paying to such nurses their compensation. The trial court interrupted the proceeding and suggested to the respondent that such evidence was inadmissible. Thereupon an objection was made and the objection was sustained. The ruling was clearly correct. (6 Thompson on Negligence, sec. 7882.)

[4] A point is made that the trial court erred in receiving as in rebuttal the testimony of Mr. McBride because his testimony should have been offered by the plaintiff as a part of his case in chief. The trial court did not err. If the appellant was taken by surprise it could have asked for a continuance, or it could have asked for the privilege of introducing any appropriate evidence to meet the evidence of Mr. McBride. Having failed to take either of those courses

the appellant may not complain. (*Nuckolls* v. *College of Physicans, etc.,* 7 Cal. App. 233 [94 Pac. 81].)

We find no error in the record. The judgment is affirmed.

Langdon, P. J., and Nourse, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 7, 1926.